Annalee PATTERSON *v.* ARKANSAS DEPARTMENT
of HEALTH; Arkansas Insurance Department;
Second Injury Trust Fund

00–604                                    33 S.W.3d 151

Supreme Court of Arkansas
Opinion delivered December 14, 2000

*Larry Hartsfield*, for appellant.

*Richard S. Smith*, for appellee Arkansas Insurance Department.

*Judy W. Rudd*, for appellee Second Injury Fund.

L AVENSKI ·R. SMITH, Justice. Appellant Annalee Patterson brings the instant appeal challenging a decision of the Arkansas Workers' Compensation Commission denying her claim for permanent and total disability benefits under the odd–lot doctrine. The court of appeals reversed the Commission's decision, and Appellees Arkansas Department of Health (ADH) and Arkansas Insurance Department, Public Employee Claims Division (PECD) petitioned this court for review of the court of appeals' decision. Appellee the Second Injury Trust Fund (SIF) filed a supplemental brief contesting any award from the Second Injury Fund, which the

court of appeals and the commission determined was not applicable in this case. We accepted review, and reverse in part and affirm in part.

*Facts*

On December 19, 1991, Patterson sustained a compensable injury to her lumbar spine when she reached across and moved her desk to plug in an electrical surge protector. Patterson, currently a fifty-year-old woman who was employed at ADH as an administrative nurse, testified that she experienced immediate pain in her back. By the end of the day she could barely walk, and during the night she went to the emergency room because her symptoms had progressed. She was admitted for three days. After her release, she received conservative care from Dr. John Wilson, an orthopedic doctor, through the end of January 1992.

Because of increasing pain and numbness, Dr. Wilson referred Patterson to Dr. Jim Moore, another orthopedic surgeon, who ordered a lumbar myelogram and contrasting CT on January 31, 1992, which revealed "significant abnormality" at the L5-S1 and L4-5 levels in her lumbar spine. Due to the nature of the injury, Dr. Moore performed a surgical decompression, and found acute disc ruptures in these discs. This surgery was the first of five over the course of Patterson's treatment.

Dr. Moore released Patterson on April 6, 1992, to work half days on a light-duty trial basis. Dr. Moore's reports after this date indicate that Patterson was working some, but that she was missing work because of pain. Reports through 1992 indicate that Patterson had returned to work, but that she was experiencing constant pain in her left leg and ankle, which Dr. Moore treated with epidural steroid injections, a splint, and specialized shoes.

In August 1993, Patterson underwent another myelogram and CT scan which indicated "marked compression at the S1 level on the right side," and ultimately underwent a second surgery on October 11, 1993. Only three months later, Patterson underwent another myelogram on January 27, 1994, which indicated continued problems in the lumbar spine, including a recurrent disc herniation at L5-S1. At this time, she was diagnosed with foot-drop syndrome in her legs and feet. However, a follow-up EMG nerve

conduction study performed on February 2, 1994, by Dr. David Miles showed no electrical abnormalities on either the left or right sides. Due to these conflicting findings, Dr. Moore referred Patterson to Dr. Thomas Fletcher for a second neurosurgical opinion to determine the proper treatment.

Dr. Fletcher saw Patterson on February 22, 1994, and he recommended a third surgery to attempt to relieve a possible S1 nerve root compression on the right side of her lumber spine. An additional surgery was performed on March 3, 1994, by Dr. Moore. Post-operative exam reports indicate that while Patterson was still experiencing tenderness and weakness, she was anxious to return to work, and was allowed to return for two days a week for half-day work. However, on June 8, 1994, Dr. Moore reported that Patterson was having difficulty at work because of continued pain and numbness. He stated in this report, "In fact, I am concerned that the patient may well not be able to return to working activities and thus may well be a candidate for consideration of retirement medically."

Patterson continued to experience pain and weakness in her back, buttocks, and legs, and Dr. Moore ordered another myelogram and CT scan on July 27, 1994. These tests revealed that Patterson was suffering from arachnoiditis in the lower thecal sac, but that additional surgery would not be beneficial at that time. Dr. Moore continued to perform local blocks in the nerves in her back, and Patterson apparently experienced some relief from these. However, due to continued radiational pain, Dr. Moore scheduled a fourth surgery on April 11, 1995, to excise some scar material around the lumbar spine. Dr. Moore's pre- and post-operative diagnoses were identical, as "pseudoradiculopathy secondary to kissing lumbar spines and bursal tissue at L4-5."

In an office note on June 21, 1995, Dr. Moore reported that Patterson fell approximately ten days prior to the office visit due to the pain and numbness in her feet and legs, and began experiencing acute radiational right lower extremity pain. Patterson reported the fall to be caused by her right foot "giving way" when she tried to walk. Another myelogram on June 26, 1995, showed definite changes from the previous myelogram. Patterson underwent her fifth and final surgery on July 11, 1995. Dr. Moore's post-operative report indicated that the surgery revealed "post-operative changes at

L4–5 and L5–S1" and that he found thecal sac material related to the arachnoiditis, and that this was causing nerve problems. A cerebrospinal fluid leak that developed after surgery was patched surgically on July 15, 1995.

Following this last surgery and cerebrospinal fluid leak, Patterson experienced increased acute low back pain, spasms, and pain radiating into her lower right leg. Patterson began a rehabilitation program at Baptist Rehabilitation Institute, and during her treatment program there, Dr. Jeffery Ketcham performed an adhesiolysis procedure to attempt to relieve the post-laminectomy scarring and radicular pain. However, Patterson experienced no relief from the procedure. Patterson also underwent an MRI at the request of Dr. Thomas Shinder, a neurologist at the The Pain Care Center, who reported in a December 7, 1995, report that he principally diagnosed arachnoiditis with significant behavioral overlay, finding that there was no objective evidence of numbness or weakness because of the spinal fluid leak. On December 14, 1995, Dr. Shinder further found possible cord injury causing an unusual pattern of spasticity and possible conversion disorder, as well as arachnoiditis. On December 21, 1995, Dr. Shinder conducted testing to determine the integrity of spinal cord functioning through posterior tibia and somatosensory testing. In essence, Dr. Shinder put Patterson under sedation to test the amount of spasticity in her lower extremities without the conscious control of the patient. After being unable to find any objective reaction even under extreme sedation, Dr. Shinder's report continued the diagnosis of possible arachnoiditis, as well as mild radiculopathy and conversion versus factitious disorder.

After testing, Dr. Shinder referred Patterson to a physical therapist beginning in January 1996, and Patterson also underwent psychological testing with Behavior Management Systems, Inc. She was given the Minnesota Multiphasic Personality Inventory (MMPI), which indicated a valid, honest profile and was within normal limits. In May 1996, Patterson underwent another pain injection at Doctor's Hospital. During this time, as well, Patterson continued to complain of increased inability to think and remember and decreased visual acuity, and Dr. Shinder's reports indicate that the pain medication was possibly causing some of the problems.

In Dr. Shinder's absence, Patterson began seeing Dr. Reginald Rutherford at The Pain Care Center in July 1996. In September

1996, Liz Batchelor, a nurse with the insurance company overseeing the workers' compensation claim, requested that Dr. Rutherford assign an impairment rating to Patterson, and on October 1, 1996, Dr. Rutherford released Patterson with a 25% impairment rating to the body as a whole. In this report, Dr. Rutherford stated that he believed that Patterson would be able to perform sedentary work, dependent on her level of motivation and the availability of work at ADH. Soon thereafter, Dr. Moore issued a report on October 3, 1996, assessing Patterson's disability percentage at 60% to the body as a whole. On November 4, 1996, he indicated that he believed Patterson would not be able to return to work, although she could perhaps perform sedentary work, but that she would have to continue on pain medication and would need transportation because she could not drive. He noted that she is relegated to a wheelchair, and that she continues to suffer from cauda equina syndrome. He also indicated that she should not make decisions related to patient care based on her cognitive limitations from the medication and pain.

During the years of treatment with Dr. Moore, Patterson was also treated and seen by several other doctors and rehabilitation specialists in relation to her injury and for a pre-injury non-work-related condition called Sjogren's Syndrome. In April 1997, Dr. Robert Cheek, Patterson's primary physician for the Sjogren's Syndrome, reviewed Patterson's medical reports at the request of Patterson's attorney, and reported that he attributed 95% of her post-injury condition to her back injury, and that the Sjogren's Syndrome really did not contribute to her limitations. He based this opinion on the fact that the Sjogren's Syndrome had not limited her work activity even after diagnosis in 1989. Another treating physician, Dr. Eleanor Lipsmeyer, also reported on the Sjogren's Syndrome, and her deposition revealed that the Sjogren's Syndrome could cause some of the symptoms that Patterson was experiencing, but that most likely the back injury was the cause of most of Patterson's symptoms.

A hearing was held on December 2, 1997, before the Administrative Law Judge. At the hearing, Patterson testified about her injury and her limitations after each surgery, and especially about her total debilitation after the fifth and final surgery. She indicated that she had been asked to resign after she used up all of her comp, vacation, and sick leave days, and that no one had ever offered her

the same job at ADH again. She testified that she did perform work for ADH approximately one day a month for $25 a day, but that it involved only contacting ADH nurses by phone, and that she performed that work at home. She also testified that she sometimes answered questions for the office staff at ADH, and that she was paid approximately $100 a month for all of the work she performed for ADH. She indicated that if she had the ability to work, she would. She further testified that her employer told her that ADH would be willing to make accommodations for her to return to work, but that this was dependent on her ability to meet the job requirements and on Dr. Moore's approval. It is not clear whether ADH actually offered Patterson a specific job. However, Patterson testified that Dr. Moore indicated that she would be unable to perform a job and should not work. At the time of the hearing, Patterson was taking four medications including oxycontin, a synthetic opiate, which she said "addled" her brain. She said that this medication makes it difficult for her to think and understand. Patterson was the only witness at the hearing, and ADH did not offer any rebuttal testimony or any testimony regarding offers of employment.

The ALJ issued his decision on February 11, 1998, finding that Patterson never received a bona fide offer of employment at wages equal to or exceeding her average weekly wage of $589.28 at the time of her injury. However, the ALJ found that Patterson was not permanently and totally disabled, but had only suffered a permanent disability rating of 80% to the body as a whole with the combined 25% anatomical impairment and the wage loss disability impairment of 55%. Furthermore, the ALJ found that no prior disability or impairment combined with the work-related injury to result in the impairment rating; therefore, the Second Injury Fund would not be liable for any of the benefits.

Patterson appealed the ALJ's decision to the commission, and on January 29, 1999, the commission affirmed the ALJ's decision in a 2-1 decision. Commissioner Humphrey dissented in part and affirmed in part, finding that while the Sjogren's Syndrome did not contribute to Patterson's permanent disability so as to relieve the Second Injury Fund from liability, Patterson was permanently and totally disabled from her work injury and five subsequent surgeries under the odd-lot doctrine.

On February 26, 1999, Patterson filed her notice of appeal from the Commission's decision to the Arkansas Court of Appeals, and the court of appeals, in a decision dated May 3, 2000, reversed the commission and found that Patterson had established a prima facie case of permanent and total disability. Furthermore, the court of appeals found that ADH failed to meet its burden of showing that work was readily and consistently available to Patterson. Finally, the court of appeals also determined that the Sjogren's Syndrome was not a contributing factor to the overall disability so that the Second Injury Fund was not liable for any benefits.

On May 22, 2000, ADH and PECD filed a Petition for Review claiming that the court of appeals's decision showed an "inconsistency" in the decisions of that court, although the parties failed to indicate what that inconsistency was. The Second Injury Fund and Patterson responded to the petition arguing that ADH and PECD offered no basis for review by the supreme court. Regardless, this court accepted review of the case.

*Standard of Review*

When we grant review following a decision by the court of appeals, we review the case as though it had been originally filed with this court. *Matthews v. Jefferson Hospital Association*, 341 Ark. 5, 14 S.W.3d 482 (2000); *Burlington Indus. v. Pickett*, 336 Ark. 515, 988 S.W.2d 3 (1999). In appeals involving claims for workers' compensation, we view the evidence in a light most favorable to the Commission's decision and affirm the decision if it is supported by substantial evidence. *Id.*; *Ester v. National Home Ctrs., Inc.*, 335 Ark. 356, 981 S.W.2d 91 (1998). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Williams v. Prostaff Temps.*, 336 Ark. 510, 988 S.W.2d 1 (1999). There may be substantial evidence to support the Commission's decision even though we might have reached a different conclusion if we had sat as the trier of fact or heard the case de novo. *Brower Mfg. Co. v. Willis*, 252 Ark. 755, 480 S.W.2d 950 (1972); *see also, Arnold v. Tyson Foods, Inc.*, 64 Ark. App. 245, 983 S.W.2d 444 (1998). In other words, we will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the conclusion arrived at by the commission. *Pickett*, 336 Ark. 515, 988 S.W.2d 3;

*Ester*, 335 Ark. 356, 981 S.W.2d 91. These rules insulate the Commission from judicial review and properly so, as it is a specialist in this areas and this court is not; however, a total insulation would render the appellate court's function in reviewing these cases meaningless. *Buford v. Standard Gravel Co.*, 68 Ark. App. 162, 5 S.W.3d 478 (1999).

■ Questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Arkansas Dep't of Health v. Williams*, 43 Ark. App. 169, 863 S.W.2d 583 (1993). We defer to the Commission's findings on what testimony it deems to be credible. *Id.* When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Id.* The Commission is not required to believe the testimony of the claimant or any other witness, but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Jordan v. Tyson Foods, Inc.*, 51 Ark. App. 100, 911 S.W.2d 593 (1995).

### Odd-lot Doctrine

■ This is an odd-lot doctrine case. Section 24 of Act 796 of 1993 [now codified at Ark. Code Ann. § 11-9-522(e) (Repl. 1999], abolished the odd-lot doctrine for permanent disability claims based on injuries that occurred after July 1, 1993; however, the doctrine is applicable to Patterson's claim stemming from her 1991 back injury. Under the odd-lot doctrine, where the claim is for permanent disability based on incapacity to earn, the Commission is required to consider all competent evidence relating to the disability, including the claimant's age, education, medical evidence, work experience, and other matters reasonably expected to affect his earning power. *Perry v. Mar-Bax Shirt Co.*, 16 Ark. App. 133, 698 S.W.2d 302 (1985).

On appeal to this court, ADH and PECD base their argument on the case of *M.M. Cohn Co. v. Haile*, 267 Ark. 734, 58 S.W.2d 600 (Ark.. App. 1979), the "odd-lot doctrine" case on which the court of appeals relied in awarding benefits to Patterson. ADH and PECD argue in their supplemental brief to this court that the elements enumerated in *Haile* apply in that Patterson did not

demonstrate that she had an "obvious physical impairment," because her main complaint is pain. Furthermore, the other criteria of mental capacity, education, training, and age were not met to allow Patterson to fall within the odd-lot category of cases. Patterson responds in her supplemental brief that her injury is an "obvious physical impairment" and that no doctor has been able to state that she will return to the work force in any true working capacity, much less to the level that she was working before the injury. Furthermore, Patterson contends that ADH never proved that there was other work available in the regular job market that Patterson could perform on a regular or continuous basis. The Second Injury Fund merely adds that it should not be liable for any benefits because the reports have consistently indicated that Patterson's debilitating condition is due only to the work-related injury and not to any other condition, including the Sjogren's Syndrome.

In determining whether Patterson falls within the ·odd-lot category of injured workers and should be eligible for permanent and total disability benefits, a two part analysis is required. First, we must consider whether the Commission erred in finding that Patterson failed to make a prima facie case of being in the odd-lot category based upon the factors of permanent impairment, age, mental capacity, education, and training. If so, then we must consider whether the Commission erred in finding that ADH did not carry its burden of showing that some kind of suitable work is regularly and continuously available to the employee, and that a bona fide offer of employment was extended to Patterson. Because our standard of review requires us to review the Commission's decision, it should be noted that the Commission found, without discussion and by adopting the ALJ's decision, that Patterson failed to ·establish by a preponderance of the evidence that she has been rendered permanently and totally disabled. Instead the Commission found that she was 80% disabled due to the back injury and residual complications alone. Furthermore, it should be noted that the Commission found that ADH did not carry its burden of proof that Patterson received a bona fide offer of employment at wages equal to or greater than her average weekly wage at the time of the injury.

■ For many years, Arkansas case law provided that an employee who was injured to the extent that he could perform services that were so limited in quality, dependability, or quantity that a reasonably stable market for them did not exist was classified

as totally disabled, because he fell within the "odd-lot" category of disabled workers. *See Rooney v. Charles*, 262 Ark. 695, 560 S.W.2d 797 (1978); *Ellison v. Therma-Tru*, 66 Ark. App. 286, 989 S.W.2d 987 (1999); *Nelson v. Timberline Int'l, Inc.*, 57 Ark. App. 34, 942 S.W.2d 260 (1997); *Moser v. Arkansas Lime Co.*, 40 Ark. App. 108, 842 S.W.2d 456 (1992), *supp. op.*, 40 Ark. App. 113, 846 S.W.2d 188 (1993). The employee need not be totally helpless. *Id*. The odd-lot doctrine refers to employees who are able to work only a small amount; the fact that they can work some does not preclude them from being considered totally disabled if their overall job prospects are negligible. *M.M. Cohn Co. v. Haile*, 267 Ark. 734, 589 S.W.2d 600 (Ark. App. 1979).

On the first prong of the application of the odd-lot doctrine, to be included in the odd-lot category, the claimant must prove that "the evidence of degree of obvious physical impairment, coupled with other factors such as claimant's mental capacity, education, training, or age, places claimant prima facie in the odd-lot category...." *Haile*, 267 Ark. at 736. In this case, the Commission adopted the ALJ's opinion on this issue. However, the ALJ's opinion is somewhat confusing when discussing the elements under this first prong. In his analysis and conclusion, the ALJ stated:

> When the entire record is reviewed, in light of claimant's age, education, work experience, level of motivation, physical condition, and other matters reasonably expected to affect her future earning capacity, the preponderance of the evidence shows that she has sustained substantial permanent disability but has not been rendered permanently and totally disabled. Even though she had sustained a significant low back injury and had undergone four surgeries, the claimant continued to return to the work place, until the consequences of the last surgery, which were more substantial. Even though she is severely limited by her physical condition and the effects of the medication related to her compensable injury, she has been able to undertake limited employment by being on call, being available to give advice over the telephone, and by doing paperwork, employment which is not constant in its demands on the claimant's time, but which is not full time and are not widely available with other employers.

What is interesting about the ALJ's and the Commission's decision is that they acknowledge that Patterson was able to return to work until after the last surgery and that she is "severely" limited by her

physical condition and the affects of the medication. They also note that the work she performed on an intermittent basis for ADH was not full time and was not widely available with other employers. Under the elements of the odd-lot category, at the time of the hearing, Patterson was 47 years old, now 50, and was a registered nurse. Her education and work experience would be that of a fairly skilled person. However, while the Commission through the ALJ notes that the medication affected her ability to work, the opinion fails to indicate how. Patterson's testimony, however, offers a better glimpse into that situation. As Patterson testified at the hearing, the effect of the synthetic opiate alone made it difficult to concentrate, understand, remain focused, or stay awake for extended periods of time, all of which would be necessary to maintain a regular job. These complaints were further supported by the medical reports wherein Dr. Moore, Patterson's main treating physician over the course of the entire history of her injury, indicated that he would not want Patterson to perform job functions that require her to make decisions about patient care. In fact, according to Patterson's testimony, ADH deferred to Dr. Moore's opinion regarding Patterson's ability to return to work.

█ Regarding her level of motivation, the record indicates that Patterson remained motivated to return to work, and there was no indication in the Commission's decision that she was not motivated. After the first four surgeries, Patterson returned to limited work with ADH, and only claimed an inability to perform substantial work after the fifth surgery. The Commission acknowledged as much. Finally, the Commission through the ALJ found that Patterson was not performing full-time, readily available work at the time of the hearing. Based on these determinations in the Commission's decision, it is clear that based on Patterson's age, education, work experience, training, and mental capacity, her prospects for future employment are severely limited. As noted, Patterson is not required to show that she can do no work; instead, she must only show that her disability only allows her to "perform services that were so limited in quality, dependability, or quantity that a reasonably stable market for them did not exist" and that while she was "able to work only a small amount" the fact that she can work some does not preclude her from being considered totally disabled if her overall job prospects are negligible. See Haile, supra.

■ Finally, on this first prong of the analysis, all of the elements must be balanced in consideration of Patterson's overall disability. For example, although Patterson is only middle-aged, her disability percentage is high at 80%. And while her education level is fairly skilled, her mental capacity has been diminished by the effect of the medication. Other cases have dealt with such opposing considerations. For example, in *Lewis v. Camelot Hotel*, 35 Ark. App. 212, 816 S.W.2d 632 (1991), the court of appeals reversed a 2-1 Commission decision denying benefits to the claimant. The court of appeals found that while the claimant only had an impairment rating of 30% to the knee, his age (55) and work history precluded him from finding any regular employment. In *Haile*, the court of appeals affirmed a finding of total disability under the odd-lot doctrine where the claimant was 62 years old but only had a 10% to 20% disability to her right upper shoulder, and she had developed psychological problems stemming from the injury and the concern of returning to work. However, in *Johnson v. Research-Cottrell*, 15 Ark. App. 48, 689 S.W.2d 8 (1985), the court of appeals affirmed the Commission's decision denying benefits to a 40-year-old man who suffered a back injury. The doctors gave him a 5% to 10% impairment rating, and the Commission found that he was actually 30% impaired based on the other factors. In *Buford*, the court of appeals reversed the Commission's denial of benefits for a 40-year-old high school graduate who sustained herniated discs in his back and who underwent three surgeries. These cases reveal that no factor, in and of itself, is determinative of the issue, but instead that all the factors, considered in the overall case, must be considered. It is clear from the Commission's decision, which adopted the ALJ's decision, that all of these factors were not considered and that the determinations made as noted above were inconsistent with each other. As such, we have determined that taking all of these factors into consideration, Patterson falls within the odd-lot category of workers.

■ This does not end the inquiry, however. Because Patterson has established that she falls within the odd-lot category of workers, the burden now shifts to ADH to establish that "some kind of suitable work is regularly and continuously available" to Patterson and that Patterson received a bona fide offer of employment at wages equal to or greater than her average weekly wage at the time of her injury. *Nelson*, 57 Ark. App. at 38. The Commission

and the court of appeals found that ADH did not meet this requirement, but because Patterson did not establish her entitlement to odd-lot consideration, the issue was moot. However, ADH argues on appeal that it, in fact, continued to make employment available to Patterson and went so far as to offer many accommodations so that Patterson could work. These accommodations included providing a cot and allowing a flex-time schedule to allow for days off when Patterson was physically unable to perform the job. On the other hand, ADH presented no evidence, and in fact relies only on Patterson's testimony, that such work was available. According to Patterson's testimony, while her supervisor told her that they would accommodate her, they would only allow her to return to work if Dr. Moore approved it. Patterson then testified that Dr. Moore told her not to return to work.

■■ The first consideration of importance in this inquiry is not whether she could return to work for her employer in some limited capacity, but whether her "overall job prospects are negligible." *Haile*, 267 Ark. at 736. In other words, the consideration does not completely depend on whether there is a particular job available in some form or fashion, but whether the level of permanent disability will affect the claimant's overall prospect for employment.*Id.*Furthermore, based on Patterson's stated limitations and the fact that she was an hourly employee of ADH, ADH provided no evidence that she could return to a job making equal or greater pay than before her injury. ADH's argument that it continued to make work available as evidenced through Patterson's testimony does not meet ADH's burden of proof. There is no proof regarding what type of job ADH was offering or whether Patterson would be making the same or greater average weekly wage than before the injury. Furthermore, ADH's alleged offer of employment was apparently predicated on Dr. Moore's approval based on Patterson's limitations. According to Patterson, Dr. Moore did not approve her return to work, and ADH offers no proof to the contrary that Patterson was able to perform a job at the department. Consequently, the Commission's determination that the preponderance of the evidence fails to show that Patterson received a bona fide offer of employment or that she could return to the work force in any meaningful manner is affirmed.

■■ Finally, ADH argues that the Second Injury Trust Fund should have been liable for payment of some benefits in this

case due to the pre-existing medical diagnosis of Sjogren's Syndrome. In*Mid-State Construction Co. v. Second Injury Fund*, 295 Ark. 1, 746 S.W.2d 539 (1988), the Arkansas Supreme Court set forth a tripartite test for Second Injury Fund liability. The test requires that:

1. The employee must have suffered a compensable injury at his present place of employment.

2. Prior to that injury the employee must have had a permanent partial disability or impairment.

3. The disability or impairment must have combined with the recent compensable injury to produce the current disability status.

*Mid-State*, 295 Ark. at 5. As the Second Injury Fund argues, there is no evidence that Patterson's Sjogren's Syndrome combined with her work injury to produce her current disability status. In fact, neither of her treating physicians, Dr. Cheek or Dr. Lipsmeyer, attributed her inability to work to the syndrome. Dr. Cheek indicated that perhaps five percent of her disability was attributed to the syndrome, but that this percentage did not affect her ability to work. Dr. Lipsmeyer agreed, but added that the five percent only referred to the swollen glands, dry eyes and mouth, and pain in her hands, and that the syndrome did not affect Patterson's central nervous system. Both doctors agreed that medication controlled the condition. Patterson herself testified that prior to her 1991 injury, she missed no work because of the syndrome, and that it was maintained with medication.

Based on these findings, we agree with the Commission that the record failed to show that there was a combination of the effects of Patterson's compensable work-related injury and with any pre-existing disability or impairment to yield greater disability than that arising from the back injury alone. Therefore, the Second Injury Fund is not liable in this case.

Reversed in part; affirmed in part.