Marcos AMAYA *v.* NEWBERRY'S 3N MILL
and AIG Claim Services

CA 07-939                                                                         282 S.W.3d 269

Court of Appeals of Arkansas
Opinion delivered April 9, 2008

*Tolley & Brooks,* P.A., by: Evelyn *E. Brooks,* for appellant.

*Worley, Wood & Parrish, P.A.,* by: *Melissa Wood,* for appellees.

LARRY D. VAUGHT, Judge. Appellant Marcos Amaya sustained a compensable injury to his back on June 2, 2004, when he stepped into a hole while attempting to carry a part of a heavy tree during the course of his employment with appellee Newberry's 3N Mill. On appeal, he argues that the Workers' Compensation Commission erred in its decision that he was not entitled to

additional temporary partial disability benefits and that he was not entitled to additional medical treatment (back surgery). We affirm in part and reverse in part.

Following his undisputed compensable injury, Amaya was treated by Dr. Shannon Card, who ultimately referred him to Dr. Kelly Danks, a neurosurgeon. Dr. Danks recommended that Amaya undergo epidural steroid injections for his back injury after the physical therapy did not resolve all of his symptoms. In a report dated March 14, 2006, Dr. Danks noted:

> Marcos returns. He had epidural steroid injection by Dr. Cannon. This only afforded him temporary relief of no more than two weeks. At this time, I have discussed his options with him, which include surgical treatment. He would most probably need a posterior lumbar interbody fusion at L4-5 and L4-S1. I do not believe surgery is going to return him to the status of being able to go back to roofing. At this time, he does not feel like he would like to proceed with surgical treatment. I have given him some Arthrotec to take. I have ordered a functional capacity to be performed on him. I will see him back after this is done.

Amaya underwent an independent medical evaluation by Dr. Steven Cathey on December 8, 2005. Dr. Cathey stated in his evaluation:

> IMPRESSION: Chronic low back pain most likely secondary to degenerative lumbar disc disease. Although Mr. Amaya most likely did suffer some type of musculoskelatal injury a year and a half ago, I believe his continued symptoms are more likely related to the degenerative changes documented on the MRI scan than to the occupational injury itself.
>
> RECOMMENDATIONS:
> 1. Although I would like to have an opportunity to review the MRI scan firsthand, I do not believe Mr. Amaya is a candidate for lumbar disc surgery, spinal fusion, or other neurosurgical intervention. Based on my review of Dr. Danks' clinic notes, I do not believe he was particularly enthusiastic about the prospects of surgery helping in this case either.
>
> 2. I believe epidural steroid injections are a reasonable treatment option at this point. I believe this should also be covered under his

workers [sic] compensation carrier. I base this on the fact that he was never offered epidural steroid injections during the initial phase of his injury and might have actually responded favorably had this been carried out.

3. Since the patient's lower back pain has been refractory to trials of physical therapy, medication, etc[. . .], I really do not see much point in continuing these options any further.

4. As far as his job is concerned, I believe Mr. Amaya will either need to return to work at a regular duty or find something else to do where he can handle himself. Again, he does seem motivated to go back to work, and I believe he should be encouraged to along these lines. Perhaps a functional capacity evaluation is in order to help return him to the workforce. He certainly does not seem to be making any progress just sitting around the house every day.

5. I believe he has essentially reached maximal [sic] medical improvement with regard to his occupational injury. Since the degenerative changes noted on the MRI scan are almost certainly preexisting, I do not believe he has sustained any long-term impairment referable to the June 2, 2004, occupational injury.

6. I have encouraged the patient to follow up with Dr. Danks to discuss these issues with him if he remains symptomatic following the epidural steroid injection later this month. As always, I stand ready to reevaluate the patient should new problems arise.

On December 20, 2005, Dr. Cathey noted that he had reviewed Amaya's MRI scan that he did not have available at the time of the IME. According to Dr. Cathey's observation:

The study shows congenital spinal stenosis. There is a right paracentral disc protrusion at L4–L5 an [sic] a smaller left paracentral disc herniation at L5–S1. I was not, however, impressed with any resulting nerve root compression or spinal stenosis at either L4–L5 or L5–S1.

ASSESSMENT/PLAN: Based on my review of Mr. Maaya's [sic] MRI scan of his lumbar spine, I do not see an indication for lumbar disc surgery or other neurosurgical intervention. None of the other opinions rendered following his independent medical evaluation have been affected by my review of the MRI scan.

On March 21, 2006, Amaya underwent a functional capacity evaluation. The evaluation report noted that he gave an unreliable effort during the evaluation. Specifically, the report stated:

RELIABILITY AND CONSISTENCY OF EFFORT

The results of this evaluation suggest that Mr. Amaya gave an unreliable effort, with 40 of 55 consistency measures within expected limits. Mr. Amaya demonstrated higher than expected coefficient of variations with repetitive trial isometric strength testing, which is an indication of inconsistent effort between repeated trials. Mr. Amaya also had inappropriate results with horizontal strength change testing, which is also an indication of inconsistent effort with isometric strength testing. Mr. Amaya also demonstrated significantly higher force with both the right and left handed rapid grip exchange, which is an indication of sub-maximal effort with the hand grip testing. Mr. Amaya's AROM with lumbar flexion was significantly limited during formal evaluation but with functional aspects of the testing, Mr. Amaya was noted to have minimal deficits with lumbar flexion. Mr. Amaya demonstrates normal movement patterns throughout testing yet demonstrated moaning with slow movement patterns with formal measurement. Mr. Amaya's pain reports did not correlate with his movement patterns and overall abilities. He moved freely throughout testing and without significant body mechanic changes that indicated pain. He demonstrates no outward expression of pain and no facial expressions indicating pain as well. These do not correlate with his subjective complaints of pain at a level 7. His movement patterns did not change when his pain was between a 4 and 7. It is further noted that Mr. Amaya was positive on Waddell's signs for non-organic back pain including passive hip rotation, overreaction to light touch, regional pain over a broad area and axial loading of the spine. These are inappropriate illness responses.

FUNCTIONAL ABILITIES

Mr. Amaya demonstrated inconsistent effort but did demonstrate the ability to perform material handling activities at the Medium level with an occasional lift/carry of 50 lbs. Mr. Amaya is able to perform the following activities on a Constant basis: Push Cart-40Lb, Pull Cart-40 Lb, Reach with 5 lb. Weight, Fingering (L), Fingering (R), Sitting and Standing, Mr. Amaya demonstrates no difficulty with sitting or standing. Mr. Amaya is able to perform the following activities on a Frequent basis: Walk, Balance, Stoop,

Overhead (R), Handling (L), Handling (R). Mr. Amaya is able to perform the following activities on an Occasional basis: Carry up to 50 Lb.

FUNCTIONAL LIMITATIONS

Mr. Amaya's true functional limitations remain unknown due to the inconsistencies that he demonstrated but he did not demonstrate the ability to handle material over 50 lbs. He performed at a level that placed him in the Frequent and Constant categories with functional activities.

CONCLUSIONS

Mr. Amaya underwent functional evaluation this date with unreliable results for effort. Overall Mr. Amaya demonstrates the ability to perform work at least at the MEDIUM Physical Demand Classification as determined through the Department of Labor.

After Amaya's functional capacity evaluation, Dr. Danks authored a letter dated May 3, 2006. He stated that he had not evaluated Amaya since his last visit on March 14, 2006, and had not seen the results of the FCE. Dr. Danks reiterated his prior discussion of surgery and Amaya's statement that he did not wish to proceed with surgery. Dr. Danks indicated that Amaya's work limitations would be dictated by the FCE and noted that, in his opinion, Amaya had reached maximum medical improvement.

After considering the evidence presented at the hearing, the Administrative Law Judge found that Amaya had not proved by a preponderance of the evidence that he was entitled to additional medical treatment in the form of back surgery. The Commission affirmed the decision of the Administrative Law Judge on this point.

The Commission then addressed Amaya's request for additional temporary total disability benefits. Specifically, the Commission was impressed with Dr. Cathey's December 8, 2005, opinion that Amaya had reached maximum medical improvement. However, the Commission could not conclude that on that date Amaya had reached maximum medical improvement, because it was hamstrung by a prior — unchallenged — ALJ opinion from January 30, 2006, following a January 5, 2006 hearing. In that opinion, the ALJ found that "[Amaya] remains within his healing period for his compensable back injury." Because there was no appeal from this decision, the Commission in the instant case

attempted to reconcile the ALJ's conclusion that Amaya was still in his healing period in late January 2006 with Dr. Cathey's opinion that he had already reached maximum medical improvement in December 2005.

In a seemingly arbitrary conclusion, the Commission affixed the termination date of Amaya's benefits, not on the date that Dr. Cathey opined, but on the date of the prior hearing, noting: "it is axiomatic that this finding only applied to the facts and evidence as presented at the January 5, 2006, hearing." The Commission went on to note that since that hearing, Amaya had undergone an FCE (on March 21, 2006) in which he was found "to have given inappropriate pain responses and an unreliable effort." The Commission also referenced Dr. Danks's letter dated May 3, 2006, where he agreed that Amaya's work restrictions would be as reflected in the FCE.

The Commission further noted that the only treatments that Amaya received after the January 5, 2006 hearing were epidural steroid injections (and a follow-up evaluation by Dr. Danks). The Commission found that the injections only afforded Amaya "temporary relief," and, "as of January 5, 2006 [Amaya] had reached a plateau in his healing that no form of additional treatment would or could alleviate. At best, [Amaya] only required palliative treatment to maintain him at this present level of healing." The Commission also went on to note that other than Amaya's "own self-serving testimony that he is unable to work, there is absolutely no evidence that [he] should be awarded additional temporary total or temporary partial disability benefits." The Commission believed that Amaya was "clearly not motivated to work" because, otherwise, he would have worked more than a day or two here and there. Based on these findings, the Commission reversed the ALJ's award of temporary partial disability benefits from January 5, 2006, through March 21, 2006 (the date of Amaya's FCE), and it is from this reversal (and the denial of his claim for additional treatment) that Amaya now appeals.

In appeals involving claims for workers' compensation, this court views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. See Kimbell v. Ass'n of Rehab Indus. & Bus. Companion Prop. & Cas., 366 Ark. 297, 235 S.W.3d 499 (2006). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. Id. The issue is not whether the appellate

court might have reached a different result from the Commission; if reasonable minds could reach the result found by the Commission, the appellate court must affirm the decision. *Id.* Where the Commission denies a claim because of the claimant's failure to meet his burden of proof, the substantial-evidence standard of review requires that we affirm if the Commission's decision displays a substantial basis for the denial of relief. *Id.* We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Dorris v. Townsends of Ark., Inc.,* 93 Ark. App. 208, 218 S.W.3d 351 (2005).

Questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Patterson v. Ark. Dep't of Health,* 343 Ark. 255, 33 S.W.3d 151 (2000). When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Id.* The Commission is not required to believe the testimony of the claimant or any other witness, but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Id* . The Commission has the authority to accept or reject medical opinions, and its resolution of the medical evidence has the force and effect of a jury verdict. *Poulan Weed Eater v. Marshall,* 79 Ark. App. 129, 84 S.W.3d 878 (2002). Thus, we are foreclosed from determining the credibility and weight to be accorded to each witness's testimony. *Arbaugh v. A G Processing, Inc.,* 360 Ark. 491, 202 S.W.3d. 519 (2005). As our law currently stands, the Commission hears workers' compensation claims de novo, and this court has stated that we defer to the Commission's authority to disregard the testimony of any witness, even a claimant, as not credible. *See Bray v. Int'l Wire Group,* 95 Ark. App. 206, 235 S.W.3d 548 (2006).

In his first point on appeal, Amaya contends that substantial evidence does not support the Commission's finding that he failed to prove that additional medical treatment (back surgery) was reasonably necessary for treatment of his injury. The law requires that "the employer shall promptly provide for an injured employee such medical, surgical, hospital, . . . and nursing services and medicine . . . as may be reasonably necessary in connection with the injury received by the employee." Ark.Code Ann. § 11-9-508(a) (Supp. 2007). However, Amaya has the burden of proving

by a preponderance of the evidence that surgery is reasonable and necessary. *Patchell v. Wal-Mart Stores, Inc.*, 86 Ark. App. 230, 184 S.W.2d 31 (2004). What constitutes reasonable and necessary treatment under this statute is a question of fact for the Commission to decide. *Gansky v. Hi-Tech Eng'g,* 325 Ark. 163, 924 S.W.2d 790 (1996).

The question that we must resolve in the first point is whether the Commission's decision denying Amaya's back surgery is supported by substantial evidence. The evidence shows that Amaya was treated conservatively for his back injury with steroid injections. In a report dated March 14, 2006, Dr. Danks noted that the injections only provided temporary relief and that he had discussed various treatment options with Amaya — including surgery. However, Dr. Danks also noted that "[a]t this time [Amaya] does not feel like he would like to proceed with surgical treatment." As a result, Dr. Danks ordered an FCE. The FCE was performed on March 21, 2006, and showed that, despite Amaya's "unreliable effort," he could still perform medium-level work. This finding is in direct conflict with Amaya's testimony that he could only work an average of two days per week before having to rest several days. After the FCE, Dr. Danks authored a letter dated May 3, 2006. He noted in the letter that he had not seen Amaya since March 14, 2006, and that he had not seen the results of the FCE. Dr. Danks went on to conclude that in his opinion Amaya had reached maximum medical improvement. Finally, and most importantly, there was evidence presented showing that Dr. Cathey unequivocally opined that Amaya's back troubles were degenerative and that he was not a surgical candidate.

After a review of the evidence, we affirm the Commission on this point. The opinions from Amaya's own physician coupled with Cathey's strong position that Amaya is not a surgical candidate satisfactorily establish that Amaya failed to meet his burden of proving that he was entitled to back surgery.

We now turn our attention to Amaya's second point of appeal, that the Commission erred in its reversal of the ALJ's award of temporary partial disability benefits through March 21, 2006 (the date of Amaya's FCE). In order to be entitled to temporary partial disability benefits, Amaya had the burden of proving by a preponderance of the evidence that he remained in his healing period and that he suffered a partial incapacity to earn wages. *Ark. State Highway & Transp. Dep't v. Breshears*, 272 Ark. 244, 613 S.W.2d 392 (1981). Amaya had the benefit of a prior hearing (held

on January 5, 2006, with the corresponding opinion filed January 30, 2006), which awarded Amaya temporary partial disability benefits beginning on June 3, 2004, and continuing through a date "yet to be determined." In the subsequent hearing the ALJ determined that the benefits would run through March 21, 2006, the date of Amaya's FCE. However the Commission reversed this award, and determined that Amaya's healing period concluded on January 5, 2006. The Commission's decision was based on the opinion rendered by Dr. Cathey back in December of 2005 that Amaya had reached maximum medical improvement. Because there was an unchallenged finding that on January 5, 2006, Amaya was still in his healing period, the Commission was unable to terminate benefits on December 20, 2005, the date Dr. Cathey opined that Amaya had reached maximum medical improvement.

The Commission discounted the fact that Dr. Cathey stated (back in December of 2005) that Amaya should have steroid injections for his back trouble and that workers' compensation should pay for the treatment. Cathey's December opinion also recommended that Amaya follow up with Dr. Danks (which Amaya did on March 14). The Commission concluded that the two injections Amaya received in 2006 were only "pain management" and his doctor's visit was just a "follow-up" — not active treatment.

■ We disagree. Our court has previously concluded that steroid injections are active treatment, and Dr. Cathey affirmatively described them as such. *See Breakfield v. In & Out, Inc.*, 79 Ark. App. 402, 88 S.W.3d 861 (2002). Further, the record demonstrates that Amaya was still under a doctor's care as late as March 14, 2006. Amaya was not officially released to return to work until March 21, 2006, the date of his FCE. As such, based on the substantial evidence presented at the hearing, Amaya's disability benefits should not have been terminated on January 5, 2006. The Commission's decision on this issue is reversed, and the case is remanded for an award of temporary partial disability benefits through March 21, 2006.

Affirmed in part and reversed and remanded in part.

PITTMAN, C.J., GLOVER, BAKER, and MILLER, JJ., agree.

GRIFFEN, J., dissents.

WENDELL L. GRIFFEN, Judge, dissenting. I agree with the majority that the claimant is entitled to receive tempo-

rary partial disability benefits through March 21, 2006. However, I would also reverse for an award of medical benefits, specifically, the surgery recommended by Dr. Kelly Danks. In denying Amaya's entitlement to the surgery, the Arkansas Workers' Compensation Commission (Commission) engaged in speculation, misapplied the results of Amaya's functional capacity evaluation (FCE), and relied on medical evidence that is plainly contrary to the record.

Amaya suffered a compensable back injury on June 2, 2004. The first MRI revealed broad-based disc bulges flattening the anterior aspect of the thecal sacs at the L3-4, L4-5, and L5-S1 levels. Additionally, at the L4-5 and the L5-S1 levels, the bulges effaced the cauda, and minimally to moderately narrowed the left neuroforamina. The bulge at the L4-5 level contained a right, paracentral component, and caudal extrusion was suspected at that level.

Dr. Danks, the treating neurologist, first saw Amaya on July 19, 2005. Based on his physical exam and the MRI, Dr. Danks concluded that Amaya had "disc protrusion on the right at L4-5 and left paracentral at L5-S1." He assessed Amaya with "herniated nucleus pulposis with lumbago" and "degenerative disease of the lumbar spine" noting that Amaya had back pain since his injury and had been unable to work. After physical therapy failed, Dr. Danks scheduled epidural steroid injections. After the steroid injections provided only temporary relief, Dr. Danks recommended a posterior lumbar interbody fusion at L4-5 and L5-S1.

At the employer's request, Dr. Steven Cathey, another neurologist, performed an independent medical evaluation (IME) on December 8, 2006. Dr. Cathey concluded that Amaya's current chronic low back pain was most likely secondary to degenerative lumbar disc disease rather than being caused by his compensable "musculoskeletal" injury. Without benefit of viewing the MRI, Dr. Cathey opined that Amaya was not a surgical candidate.

Nonetheless, Dr. Cathey opined that epidural steroid injections were "a reasonable treatment option" and further stated that, "I believe this should also be covered under his worker's compensation carrier." He also encouraged Amaya to follow-up with Dr. Danks if he remained symptomatic after receiving the injections. Finally, Dr. Cathey determined that Amaya had reached maximum medical improvement (MMI) and suggested a FCE. Dr. Cathey later reviewed the MRI but did not change his conclusions.

Dr. Danks ordered the FCE, which was performed on March 12, 2006. The evaluator concluded that Amaya put forth

"unreliable results for effort" and displayed inappropriate pain responses. The evaluator concluded that Amaya could perform medium–duty work.

Dr. Danks never saw the FCE results even though he knew that the FCE had been performed. On May 3, 2006, he reiterated that he had recommended fusion surgery, which Amaya had initially refused, and stated that Amaya's work limitations would be dictated by his FCE. He also stated that Amaya had reached MMI. (Amaya later consented to the surgery, which he had refused only because he had no one to provide post-surgical care in his home).

I would reverse the Commission's determination that Amaya is not entitled to surgery, first, because it misapplied the FCE results to determine Amaya's entitlement to surgery — a purpose not intended by the test, which is used to determine those jobs a person can safely perform. Second, the Commission misused the FCE results to speculate that Dr. Danks may have reversed his surgical recommendation based on the FCE results. It stated, "There is no indication whatsoever that Dr. Danks is still of the opinion that surgery is necessary, particularly when the FCE is considered and Amaya was giving unreliable effort and demonstrated inappropriate illness responses."

Thus, in determining that Amaya was not entitled to surgery, the Commission clearly and improperly speculated by basing its decision *on medical evidence that is not in the record*. Conjecture and speculation, even if plausible, cannot take the place of proof. *See Lohman v. SSI, Inc.*, 94 Ark. App. 424, 232 S.W.3d 487 (2006). The medical records that we have unequivocally indicate that Dr. Danks never changed his surgical recommendation, even after being informed that the FCE had been performed. To the contrary, he thereafter *again* recommended surgery and further stated that the FCE would determine Amaya's work limitations. Dr. Danks's determination that Amaya needed surgery was based on the *objective* MRI results, which were not altered by the *subjective* FCE results.

Secondly, while the Commission is entitled to weigh the evidence, it is not entitled to rely on a medical opinion that is contrary to the evidence in the record. Dr. Cathey stated on December 8, 2006, that Amaya had reached MMI; that he was not a surgical candidate because his problems were degenerative in nature; and that the employer should pay for Amaya's steroid injections. Dr. Cathey's opinion is unreliable, as an initial matter,

because he inconsistently opined that Amaya reached MMI, yet also recommended further treatment at the employer's expense. Moreover, Dr. Cathey disregards: 1) the fact that the MRI contains more than degenerative findings, including tri-level herniated discs flattening the anterior aspect of the thecal sacs at each level and bi-level caudal effacement; 2) the fact that Amaya has no history of prior back problems; and 3) the fact that he was able to perform his job with no limitations prior to suffering the compensable injury to his back.

On these facts, reasonable minds should not have concluded that Amaya's back condition is due to his degenerative condition. Accordingly, I would reverse the Commission's denial of additional temporary partial disability benefits, and would also reverse that part of the Commission's order finding that Amaya is not entitled to the surgery recommended by Dr. Danks.