2010 Ark. App. 99

**Derrick L. FLOWERS, Appellant**

v.

**ARKANSAS STATE POLICE;
Public Employee Claims
Division, Appellees.**

**No. CA 09–940.**

Court of Appeals of Arkansas.

Feb. 3, 2010.

Rehearing Denied March 10, 2010.

340

John Mark White, Bryant, AR, for appellant.

Richard Sterling Smith, Jr., Little Rock, AR, for appellee.

ROBERT J. GLADWIN, Judge.

Appellant Derrick L. Flowers appeals the July 7, 2009 decision of the Arkansas Workers' Compensation Commission finding that he has a permanent-physical impairment in the amount of eight percent to the body as a whole as a result of his compensable injuries. Appellant contends that the Commission erred in denying his claim for a thirty-seven-percent impairment rating, which was given by Dr. Stephen Bennett, as opposed to the eight-percent rating given by Dr. Barry Baskin, who performed an independent-medical evaluation on behalf of appellees Arkansas State Police and the Public Employee Claims Division.

Appellant, born December 9, 1957, has been employed by the Arkansas State Police since June 1, 1980. He is a high-school graduate with a Bachelor's degree in Political Science and Sociology, a Master's degree in Sacred Theology, a Doctorate of Ministry, and is currently a sergeant with the state police. Appellant's claim arose from an automobile accident, which occurred on August 26, 2005, and was described by appellant as follows:

> I was on duty at night, traveling on a highway through the City of Lepanto, Arkansas. And, while traveling through the city, someone traveling in the opposite direction turned left directly into my path. I applied my brakes, and my vehicle collided with that vehicle.

Appellant claimed that he was traveling approximately thirty miles per hour at the time of the accident, and that, while he felt a "jolt" at the time of impact, he did not experience any pain until later. He claimed that he later experienced pain in his low back and neck, as well as headaches.

Dr. Steven F. Bennett, D.C., treated appellant with therapy, massages, and, as described by appellant, "some type of machine was used to manipulate my muscles, chiropractic examinations. I also received a[n] MRI." Appellant claimed that Dr.

Bennett's treatment improved his condition. He continued to treat with Dr. Bennett for the residual pain symptoms he attributes to the August 26, 2005 accident. He does not take prescription medication.

As noted above, appellant continues in the employment of the state police; however, he is no longer a highway-patrol officer, but now works in administration, which is off the streets and does not require him to perform strenuous activities. He claims that he now has to give more thought to the activities in which he participates. Further, that he is no longer able to participate in sports with his children and must be careful about sitting and standing so as not to aggravate his injury.

On January 23, 2007, appellant underwent an evaluation by Dr. Barry D. Baskin. He denies that he described or characterized to Dr. Baskin that the August 26, 2005 motor-vehicle accident as being "fairly minor." He further stated,

> I was uncomfortable on that table, simply because on the table, there's no back there. And I just want to say that I've got a lot of respect for physicians that if they tell me to do something, I'll do it, so I didn't even complain about having to sit up on the table without back support. Eventually, I recall him asking me to stand; I stood. I recall him asking me to twist to the left and then to the right, and I also recall him asking me to bend over and touch the floor, and I did my best to do exactly what he told me to do.

Appellant characterized his conversation with Dr. Baskin following the examination as a conversation about life.

Appellant acknowledged sustaining a prior injury to his back within the course and scope of his employment in the 1980s when lifting a suitcase from the trunk of a vehicle. He was working in executive-protection detail, which provided service to the governor of Arkansas in the form of protection and transportation. Appellant sought and obtained treatment under the care of Dr. Bennett for the back complaint, which resolved after a period of approximately six weeks. Appellant did not obtain back treatment from Dr. Bennett again until the August 26, 2005 motor-vehicle accident.

Dr. Steven Bennett, a chiropractic orthopedist for over twenty-five years, testified that he treats a lot of trauma injuries, most of which deal with the musculoskeletal areas. He stated that he was certified in impairment rating by the Los Angeles Chiropractic College, has a Diplomatic Degree in Chiropractic Orthopaedics, is certified in advanced study of whiplash injuries from the Spine Research Institute of San Diego, and has his certification in spinal trauma by the International Chiropractic Association. He is also certified as a low-impact-accident reconstructionist from the Spine Research Institute of San Diego. Dr. Bennett is certified in the advanced study and diagnosis of the clinical management of acceleration/de-acceleration injuries, which deals with trauma from motor-vehicle accidents. He has participated in crash studies with General Motors, San Diego Spine Institute, and Texas A & M. Dr. Bennett stated that he utilizes the Fourth Edition of AMA Guides in his practice.

For the August 26, 2005 accident, appellant was diagnosed by Dr. Bennett with lumbar radicular neuralgia-lumbar-disc injury, and a lumbar sprain/strain to the muscles. Dr. Bennett testified that appellant has disc degeneration that showed on his x-rays. Orthopaedic and neurologic testing also revealed that appellant had a disc injury. Appellant had pain radiating specifically into the L5 dermatome, indicating a nerve-root irritation. An MRI confirmed that he had a disc herniation,

which was more than just a bulge, and he had a torn disc. Dr. Bennett also said that appellant was diagnosed with a cervical sprain/strain.

Dr. Bennett explained the possible causes for the loss of curvature of the spine:

Well, there's several factors. One (1) can be simply muscle spasms at the time can cause that. Typically, if it's muscle spasms, as the muscle spasms resolve, the curve returns. The other thing can also be ligament damage. When ligament damage occurs, the inner lying structures that hold these vertebrae in the proper position is no longer—the integrity of those ligaments have been damaged; they won't hold it in its proper position, and then you have the straightening of that curve, or even a reversal, but his was a straightening.

Dr. Bennett assigned a permanent-impairment rating to appellant, based on the AMA Guides, Fourth Edition, as a result of the injuries growing out of the August 26, 2005 motor-vehicle accident. Dr. Bennett testified regarding the methodology and the application of same utilizing the AMA Guides in arriving at appellant's impairment rating:

In Mr. Flowers' situation, there was multiple things that took place to arrive at his impairment rating. We looked at MRI results, x-ray results; we did videothoroscopy, which is x-rays in motion to evaluate the integrity of the joint movement in his neck. We took all of these factors, we put them together; we also did other diagnostic tests that would consist of what's called computer inclinometers and dynamometer testing. And, basically, what that is, is if you have somebody just move back and forth, there's a lot of subjectivity to that. So, what—and if you test somebody's muscle strength, and I just walk up and

test them, there's some subjectivity to it because the research shows that me just testing somebody manually, until they lose about fifty percent of their strength, you're not really gonna be able to see that they have much strength loss. What we do is, according to the Guides, they have said that the most accurate objective form of testing is through computerized inclinometers, which measures range of motion. What that does is it measures movement. Like, if I just want to isolate the neck, it will take measurement of the neck and, if I move my shoulders downward, which would make it seem like I got more movement, it will take out the shoulder movement. That way, it isolates only the area that you're wanting to test.

And so the Guides say that that's the most objective, so we test with the inclinometers to get an accurate range of motion. We also test with dynamometers, which are computerized, which can measure loss of muscle strength. Whereas, manually testing it with just me walking up and testing somebody for their strength of their biceps, have to lose at least fifty percent before you can really tell a difference. With the computers, they're able to detect the difference at ten percent or less, even with it. So, we get a lot more objectivity. Plus, within the computers, there's software that we repeat these multiple times in the same setting so that it validates whether or not this patient is giving a true valid effort. If the patient's not giving a valid effort, it will say, no, there was not a valid effort given. And so, in that situation, we know that that patient—maybe pain, maybe not trying, maybe trying to fool the test—there was no valid effort. So it gives us very good objectivity to be able to evaluate a patient.

Dr. Bennett assessed a thirty-four-percent permanent impairment to appellant's body based on the AMA Guidelines to the Evaluation of Permanent Impairment, Fourth Edition. Appellant's impairment was based on permanent damage to the cervical and lumbar spinal regions involving injuries to the discs, ligaments, muscles, and cervical-nerve roots. In a November 9, 2006 report to appellees, Dr. Bennett set forth the specific pages and table utilized from the AMA Guides, Fourth Edition, in arriving at appellant's anatomical impairment. A November 19, 2006 clarification from Dr. Bennett to respondents relative to appellant's impairment rating reflects, in pertinent part:

> Going back to the other areas of impairment, if they are all combined utilizing the combining tables in the AMA Guides while omitting the range of motion impairments, Mr. Flowers is left with a 33% whole person impairment....

On January 23, 2007, appellant was evaluated by Dr. Barry D. Baskin at the request of appellees. The report regarding the evaluation reflects that appellant's chief complaints were pain in the left-low back, occasional numbness and tingling in the feet and hands, and infrequent headaches. Dr. Baskin's report addresses the results of appellee's prior diagnostic studies, as reflected in the records of Dr. Bennett and other providers, to include those findings relative to appellant's cervical spine. The January 23, 2007 report of Dr. Baskin further reflects in pertinent part:

PHYSICAL EXAMINATION: Mr. Flowers ... is noted to enter the office with a normal gait, without use of an assistive device, without any limp. His neuromuscular exam reveals cranial nerve to be intact. Deep tendon reflexes are 2+ and symmetric. He has negative Hoffman's reflex. Withdrawal plantar responses. He has good muscle mass in all four extremities. There was no atrophy. He has normal posture. His cervical spine does not reveal any excessive kyphosus or lordosis. He has good range of motion in all planes. He can turn his head over his shoulder, left, right, and also has good lateral bending, good flexion and extension. No muscle spasm was palpable in the cervical spine. He has normal dorsal spine without kyphosis or scoliosis. No scapular winging was noted. He has full scapular excursion. He has normal muscle in the shoulder girdles. He is a very muscular, broad-shouldered, stocky individual. His lumbar spine reveals normal lordosis. He has full range of motion. I asked him to bend over comfortably as far as he could and he was able to bend over and easily put his fingers down to the floor with his knees extended. He has full range of motion in the lumbar spine in flexion, extension, lateral bending and rotation. There were no deficits. He has a negative straight leg raise. He has negative Patrick's test. He does not complain of sciatic or significant low back pain. His lumbosacral spine did reveal some diffuse tenderness to palpation in the lumbosacral junction down over the PS IS area bilaterally. His muscle strength was gauged to be 5 out of 5 in all muscle tested. Sensation was intact to pinprick, and light touch throughout. He had a subjective sensation of numbness in the hand, but he could distinguish sharp from dull easily in the hands and the feet throughout. IMPRESSION: Mr. Flowers is a nice 49 year old gentleman who was involved in a motor vehicle accident on 8/26/05. His MRI scan done on 10/4/05 revealed him to have disc desiccation at L4–5 with mild diffuse disc bulge, early facet degenerative changes resulting in mild to moderate bilateral foraminal narrowing, a small broad based central disc

protrusion with associated annular tear and disc desiccation and degenerative changes also at L5–S1 with a broad based left paracentral disc protrusion impinging on the ventral aspect of the left L1 nerve root. Mr. Flowers has a normal neuro exam. His reflexes are symmetric. His strength is good. This gentleman has evidence of degenerative changes that were noted, including facet hypertrophy and disc desiccation on his MRI scan, which was done approximately 5 weeks after his motor vehicle accident on 8/26/05. These changes indicate that this patient had preexisting degenerative disc disease. He does have annular tears at 2 disc levels with a central disc protrusion at L4–5 and degenerative disc disease at L5–S1 with a broad based left paracentral protrusion and bilateral foraminal narrowing. He has no evidence of muscle atrophy or sensory deficit on exam, although he does complain of numbness in his hands and feet. My impression of the numbness in the hands is that it is likely due to carpal tunnel syndrome. He has been given a fairly significant impairment rating based primarily on DMX x-rays by Dr. Bennett. He has been rated on his neck and lumbar spine. He has no complaints of cervical pain at this time. On his pain drawing, his cervical spine is not even marked. When asked what is bothering him, he doesn't suggest that his neck is hurting. His range of motion is excellent in the cervical spine and the lumbar spine. My overall impression is that Mr. Flowers was involved in a motor vehicle accident, that he describes as fairly minor, on 8/26/05. He does have some objective findings in the lumbar spine. These objective findings, I believe, in large part were preexisting given that they were noted within 5 weeks of the date of his accident and appear to be mostly degenerative in nature with

disc desiccation, as well as facet changed. These are the typical arthritic changes that one would expect to see in a 48 or 49 year old gentleman of this stature, who has led an active lifestyle. Given the fact that we have no imaging studies of Mr. Flowers' back preceding the motor vehicle accident of 8/26/05, I cannot say that some of the changes noted, in particular the disc protrusions, were not caused, at least in part, by the motor vehicle accident. Degenerative disc are more prone to injury than healthy disc. It is my opinion that Mr. Flowers has reached maximum medical improvement. He is moving well, has normal strength, normal sensation on exam, and overall a normal neuro exam. I do not predict any additional treatment would be required for Mr. Flowers for his injury related to the 8/26/05 accident. I would recommend that he take part in an active home exercise program.

Mr. Flowers does have some degenerative changes in his lumbar spine but, again, I cannot say with reasonable medical probability that some of those protrusions were not caused by the motor vehicle accident. Using the AMA Guidelines Fourth Edition, page 113, table 75, Mr. Flowers would have a 7% impairment to the lumbar spine based on the L5–S1 degenerative disc with a broad based disc bulge and protrusion paracentral in nature causing bilateral foraminal narrowing. Again, this may have been preexisting, but I can't say for certain. He would have an additional 1% impairment to the L4–5 level, giving him a total of 8% permanent partial impairment to the whole person based on his injuries sustained on 8/26/05. Mr. Flowers does not have any impairment to his cervical spine.

Based upon Dr. Baskin's assessment, the Administrative Law Judge denied ap-

pellant's claim, finding that the evidence preponderated that the cervical-spine complaint did not result in any permanent impairment greater than eight percent, and that Dr. Baskin's opinion was more credible. The Full Commission affirmed and adopted the opinion of the ALJ, and this appeal timely followed.

In reviewing decisions from the Workers' Compensation Commission, this court views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's decision and affirms if that decision is supported by substantial evidence. *United Farms, Inc. v. Gist,* 2009 Ark. App. 717, 374 S.W.3d 23. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* The issue is not whether the reviewing court might have reached a different result from the Commission; if reasonable minds could reach the result found by the Commission, we must affirm the decision. *Id.*

Questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Patterson v. Ark. Dep't of Health,* 343 Ark. 255, 33 S.W.3d 151 (2000). When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Id.* The Commission is not required to believe the testimony of the claimant or any other witness, but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Id.* The Commission has the authority to accept or reject medical opinions, and its resolution of the medical evidence has the force and effect of a jury verdict. *Poulan Weed Eater v. Marshall,* 79 Ark.App. 129, 84 S.W.3d 878 (2002). Thus, we are foreclosed from determining the credibility and weight to be

accorded to each witness's testimony. *Arbaugh v. AG Processing, Inc.,* 360 Ark. 491, 202 S.W.3d 519 (2005). As our law currently stands, the Commission hears workers' compensation claims de novo on the basis before the ALJ, and this court has stated that we defer to the Commission's authority to disregard the testimony of any witness, even a claimant, as not credible. *See Bray v. Int'l Wire Group,* 95 Ark.App. 206, 235 S.W.3d 548 (2006).

Permanent impairment is any permanent functional or anatomical loss remaining after the healing period has been reached. *Johnson v. Gen. Dynamics,* 46 Ark.App. 188, 878 S.W.2d 411 (1994). An injured employee is entitled to the payment of compensation for the permanent functional or anatomical loss of use of the body as a whole whether his earning capacity is diminished or not. *Id.*

> The Workers' Compensation Act of 1993 directed the Commission to adopt an impairment-rating guide to be used in the assessment of anatomical impairment, and the Commission adopted the AMA Guides. Thus, in all cases where entitlement to a permanent impairment is sought by the claimant but controverted by the employer, it is the Commission's duty to determine, using the AMA Guides, whether the claimant met his burden of proof. This being the case, we hold that the Commission can, and indeed, should, consult the AMA Guides when determining the existence and extent of permanent impairment, whether or not the relevant portions of the Guides have been offered into evidence by either party.

*Polk County v. Jones,* 74 Ark.App. 159, 164, 47 S.W.3d 904, 907 (2001).

Appellant contends that, here, Dr. Bennett assigned him a permanent-impairment rating, based on the AMA Guides,

composed of four individual-impairment ratings—two for the lumbar spine and two for the cervical spine. Dr. Barry Baskin, hired by appellees to give a second opinion, agreed with one of the lumbar-spine ratings, gave no opinion as to the other lumbar-spine rating, and opined that appellant sustained no impairment to his cervical spine. Appellant argues that the ALJ made only two relevant findings—that appellant sustained no permanent impairment to his cervical spine and that Dr. Baskin's opinion was more credible than Dr. Bennett's. Appellant claims that the Commission's decision cannot be reconciled with the specific criteria of its chosen impairment-rating guide. Further, appellant contends that the Commission made inadequate findings to support a denial of benefits. Therefore, appellant argues that substantial evidence does not support the Commission's denial of his claim.

Appellant asserts that Dr. Bennett assigned an impairment rating for spondylolisthesis at the L3 level of the lumbar spine based on the AMA Guides. He points out that Dr. Bennett compared flexion and extension x-ray films and utilized a computer to measure the amount of movement between the vertebrae to determine the rating of impairment. However, Dr. Baskin gave no opinion as to whether this rating was appropriate. He did note that spondylolisthesis was not shown on the MRI. Appellant argues that Dr. Bennett explained why the MRI did not ordinarily show spondylolisthesis, but that the Commission still ignored Dr. Bennett's impairment rating for it.

Appellant contends that because the Commission made no factual findings regarding the presence or absence of spondylolisthesis in appellant's lumbar spine, no factual findings regarding the x-ray evidence establishing spondylolisthesis, and no factual findings as to whether or not he met the criteria of the AMA Guides for an impairment rating due to spondylolisthesis, this court should reverse and remand to the Commission to make specific factual findings on this issue. Appellant also argues that because the x-ray films that demonstrated the presence of spondylolisthesis at the L3 level are undisputed, appellant is qualified for additional impairment of seven percent to the body as a whole pursuant to the impairment-rating guide.

Appellant argues that Dr. Bennett assigned an impairment rating of fourteen percent for loss-of-motion segment integrity in the cervical spine and that the AMA Guides provide for an impairment rating as high as twenty-five percent for this. Dr. Bennett used digital motion x-ray and computer software to identify movement and he described his evaluation as totally objective. Dr. Baskin did not dispute or question the x-ray findings, stating, "Mr. Flowers does not have any impairment to his cervical spine." Appellant argues that the Commission failed to acknowledge the x-ray findings, stating only that "the evidence preponderated that the cervical spine complaint has not resulted in any permanent impairment." Appellant contends that because the Commission made no factual findings to support this conclusion, its decision should be reversed. Again, appellant maintains that Dr. Bennett's x-ray findings are undisputed-objective findings provided for in the AMA Guides and that there is no substantial evidence by which the Commission could have denied benefits.

Appellant finally contends that Dr. Bennett assigned an impairment rating of nine percent for diminished strength in the left-upper extremity due to nerve-root irritation in the cervical spine at C5 through C8. He graded the loss of strength as a grade four, which the AMA Guides define as a

deficit between one and twenty-five percent. Dr. Baskin opined that appellant had no loss of strength. Appellant contends that the difference in opinion is due to how each doctor measured the loss of strength. He points out that Dr. Baskin measured the strength loss by his own subjective feel. Appellant argues that Dr. Bennett, however, measured loss of strength by using computerized dynamometers, which can detect loss of strength as small as ten percent and are more objective than the manual-testing method.

Appellant maintains that the Commission did acknowledge the differing opinions here, but made no factual findings other than its summary conclusion that appellant had no cervical impairment. Again, appellant argues that Dr. Baskin did not question or dispute Dr. Bennett's computerized testing, but simply substituted his own manual testing to make his conclusion. Appellant argues that reasonable minds could not give Dr. Baskin's opinion more probative weight than Dr. Bennett's on this issue. Therefore, appellant claims that the Commission's denial of benefits for this impairment rating for diminished strength is not supported by substantial evidence.

Appellees contend that appellant's argument is that the Commission did not make specific factual findings to support its conclusions; i.e., to accept Dr. Baskin's assessment over that of Dr. Bennett's. Appellees claim that that argument is not supported by the record. We agree. Looking to the ALJ's opinion, which was affirmed and adopted by the Commission, it is clear that the Commission found Dr. Baskin's conclusions and report to be more persuasive than that of Dr. Bennett. It is the Commission's duty, as the trier of fact, to determine which witnesses or medical opinions deserve more or less weight than

others. *City of Humphrey v. Woodward,* 4 Ark.App. 64, 628 S.W.2d 574 (1982).

Dr. Baskin noted in his report that appellant described his accident as "fairly minor." This was denied by appellant, and Dr. Bennett professed to find it unbelievable that appellant would make that statement. Photographs of the appellant's car after the accident were in evidence. Therefore, it was reasonable for the Commission to conclude that the appellant told Dr. Baskin that the accident was "fairly minor."

Dr. Baskin reviewed 150 pages of appellant's medical records, including the MRI report of October 4, 2005. As indicated by the report as set forth above, Dr. Baskin noted that appellant made no complaint about his cervical spine, and on his pain drawing, appellant did not mark the cervical spine. The exam showed a full range of motion of both the cervical spine and the lumbar spine. Appellant offered as justification for his lack of complaints that he respects doctors and thinks he should just try to do whatever they ask him without complaining.

Finally, while the statute and Commission Rules require that impairment ratings be based upon the AMA Guidelines, Fourth Edition, not everything in the guidelines is admissible under the Act. Arkansas Code Annotated section 11-9-704 requires that the extent of physical impairment be supported by objective and measurable physical findings. Ark.Code Ann. § 11-9-704(c)(ii)(B) (Repl.2002). Objective findings are those which cannot come under the voluntary control of the patient, and specifically excludes pain, straight-leg-raising tests and range-of-motion tests. Ark.Code Ann. § 11-9-102(16)(A) (Repl. 2002). Much of the testing methodology utilized by Dr. Bennett tests range-of-motion in some way. Further, the statute specifically excludes complaints of pain and

straight-leg-raising tests as criteria. *Id.* In other words, although pain, active range-of-motion, and straight-leg-raising tests are criteria used in the Guidelines, they may not be used in Arkansas for assessment of impairment in workers' compensation cases. *See Wilson v. Smurfit Stone Container,* 2009 Ark. App. 800, 373 S.W.3d 347; *Hayes v. Wal–Mart Stores,* 71 Ark.App. 207, 29 S.W.3d 751 (2000).

Viewing the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's decision, and finding substantial evidence to support that decision, we affirm.

Affirmed.

MARSHALL and BAKER, JJ., agree.