2011 Ark. App. 219

**HOPE SCHOOL DISTRICT and Risk Management Resources, Appellants**

**v.**

**Charles E. WILSON, Appellee.**

**No. CA 10–1069.**

Court of Appeals of Arkansas.

March 16, 2011.

Jarrod S. Parrish, Little Rock, for appellants.

Gregory Ross Giles, Texarkana, for appellee.

DOUG MARTIN, Judge.

Appellant Hope School District (the District) appeals a decision of the Workers' Compensation Commission awarding permanent partial disability benefits and a 2% wage-loss benefit to appellee Charles Wilson. Wilson cross-appeals the Commission's denial of his request for additional temporary total disability benefits and his request for more than a 2% wage-loss benefit. We find no error and affirm.

Wilson worked as a custodian for the District and suffered an admittedly compensable injury to his left shoulder on August 17, 2007. The District paid temporary total disability benefits through November 30, 2007. Wilson returned to work on February 19, 2008, and was given a revised schedule of work duties to accom-modate his injury. On April 30, 2008, Wilson's supervisor, Maurice Henry, asked Wilson if he planned to return to work for the District the following school year. In response, Wilson signed a "letter of intention" indicating that he did not want to be employed as a custodian for the District during the 2008–2009 school year. Wilson's employment with the District ended in August 2008.

Wilson's shoulder injury was treated by Dr. Young, an orthopedic physician. In addition, Dr. Holladay examined Wilson in April 2009 and assigned him an 11% upper extremity impairment that was converted into "a 7% whole-person impairment as residual from the work-related injury."

Wilson subsequently sought additional temporary total disability benefits for work missed from December 1, 2007, to February 19, 2008. In addition, he sought permanent partial disability benefits associated with the 7% permanent impairment rating he was assigned, wage-loss disability benefits, and additional medical treatment.

After a hearing on December 3, 2009, the administrative law judge (ALJ) entered an opinion on February 25, 2010, denying Wilson's request for additional temporary total disability benefits; finding Wilson entitled to permanent partial disability benefits and awarding him benefits for a 7% anatomical impairment rating to the body as a whole; finding that Wilson's claim for wage-loss benefits was not barred by Arkansas Code Annotated section 11–9–522(b); and finding that Wilson's request for additional medical treatment was reasonable. The District appealed the ALJ's findings, and the Commission adopted and affirmed the ALJ's decision in an opinion and order entered August 13, 2010. The District filed a timely notice of

appeal, and Wilson filed a timely notice of cross-appeal.

### Standard of Review

Typically, on appeal to this court, we review only the decision of the Commission, not that of the ALJ. *Daniels v. Affiliated Foods Sw.,* 70 Ark.App. 319, 17 S.W.3d 817 (2000). In this case, the Commission affirmed and adopted the ALJ's opinion as its own, which it is permitted to do under Arkansas law. *See Death & Permanent Total Disability Trust Fund v. Branum,* 82 Ark.App. 338, 107 S.W.3d 876 (2003). Moreover, in so doing, the Commission makes the ALJ's findings and conclusions the findings and conclusions of the Commission. *See Branum, supra.* Therefore, for purposes of our review, we consider both the ALJ's order and the Commission's majority order.

In appeals involving claims for workers' compensation, our court views the evidence in the light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. *Galloway v. Tyson Foods, Inc.,* 2010 Ark. App. 610, at 5, 378 S.W.3d 210, 213–14. Substantial evidence exists if reasonable minds could reach the Commission's conclusion. *Galloway,* 2010 Ark. App. 610, at 5, 378 S.W.3d at 213–14. The issue is not whether the appellate court might have reached a different result from the Commission; if reasonable minds could reach the result found by the Commission, the appellate court must affirm. *Id.* Where the Commission denies a claim because of the claimant's failure to meet his burden of proof, the substantial-evidence standard of review requires that we affirm the Commission's decision if its opinion displays a substantial basis for the denial of relief. *Id.*

Questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission, and when there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Neal v. Sparks Reg'l Med. Ctr.,* 104 Ark.App. 97, 102, 289 S.W.3d 163, 167 (2008). The Commission is not required to believe the testimony of the claimant or any other witnesses but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Id.*

### Direct Appeal

In its first argument on direct appeal, the District argues that the Commission erred in finding that Arkansas Code Annotated sections 11–9–522(b) and 11–9–526 did not bar Wilson's wage-loss claim.[1] Permanent benefits shall be awarded only upon a determination that the compensable injury was the major cause of the disability or impairment. Ark.Code Ann. § 11–9–102(4)(F)(ii)(a) (Supp.2009). In order to receive wage-loss-disability benefits in excess of one's permanent physical impairment, a claimant first must prove by a preponderance of the evidence that he sustained permanent physical impairment as a result of a compensable injury. *Bio–Tech Pharmacal, Inc. v. Blouin,* 2010 Ark. App. 714, 379 S.W.3d 594; *Taggart v. Mid Am. Packaging,* 2009 Ark. App. 335, at 4, 308 S.W.3d 643, 646. The wage-loss factor is the extent to which a compensable injury has affected the claimant's ability to earn a livelihood. *Taggart,* 2009 Ark. App. 335, at 5, 308 S.W.3d at 647. In considering

---

1. Although the District addresses these arguments under three separate subpoint headings, the arguments are so intertwined that they are addressed together herein.

claims for permanent partial disability benefits in excess of the employee's percentage of permanent physical impairment, the Commission may take into account, in addition to the percentage of permanent physical impairment, such factors as the employee's age, education, work experience, and other matters reasonably expected to affect his or her future earning capacity. Ark.Code Ann. § 11–9–522(b)(1) (Repl.2002).

Section 11–9–522(b)(2) goes on, however, to provide that

so long as an employee, subsequent to his injury, has returned to work, has obtained other employment, or has a bona fide and reasonably obtainable offer to be employed at wages equal to or greater than his or her average weekly wage at the time of the accident, he or she shall not be entitled to permanent partial disability benefits in excess of the percentage of permanent physical impairment established by a preponderance of the medical testimony and evidence.

The employer bears the burden of proving the employee's receipt of a bona fide offer to be employed. Ark.Code Ann. § 11–9–522(c)(1).

The District argues that the Commission erred in finding that Wilson did not have a "bona fide and reasonably obtainable offer to be employed" by the District. As mentioned above, Wilson informed the District at the end of April 2008 that he did not want to be employed by the District for the 2008–2009 school year. In addition, the District offered the testimony of Maurice Henry, the District's Co–Safety and Health/Custodial Supervisor, and Kathryn Montgomery, the District's Co–Safety and Health/Workers' Compensation Coordinator. When asked whether, had Wilson not resigned in 2008, he could still be working for the District, Henry answered, "He would have been *recommended.*" (Emphasis added.) Similarly, when asked whether the District was going to let Wilson continue working in the fall semester of 2008 if he had not retired, Montgomery stated, "He would have been *recommended* like the rest of the staff." (Emphasis added.)

On the basis of this testimony, the ALJ and the Commission made the following findings:

The evidence establishes that the claimant was employed on an annual school-year basis. The claimant stopped working in August of 2008 when his 2007–2008 contract ended. In *Belcher v. Holiday Inn,* 43 Ark.App. 157, 868 S.W.2d 87 (1993), the Court explained that "11–9–522(b) precludes a claim for wage loss benefits as a matter of law only during such time as the claimant has returned to work, obtained other employment, or has a bona fide and reasonably obtainable offer to be employed at wages equal to or greater than her average weekly wage at the time of the accident." Consequently, I find that the claimant's employment at Hope School District was no longer a bar to benefits for wage loss once that employment ended at the end of the 2007–2008 contract in August of 2008.

I also find that the preponderance of the evidence establishes that the claimant did not receive a bona fide offer of employment for any period after he last worked in August of 2008. To the contrary, both Mr. Henry and Ms. Montgomery indicated that had the claimant requested employment for the new school year beginning in August of 2008, he would have been *recommended* for employment. Clearly, a possible recommendation for employment is not the same as an offer of employment. The statutory bar requires an actual *offer* of

employment. *Cross v. Crawford County Memorial Hosp.*, 54 Ark.App. 130, 923 S.W.2d 886 (1996). No such actual offer was made in this case.

(Emphasis in original.)

This court has noted that there must be an actual offer of employment made by the employer to the employee. *Cross v. Crawford County Mem'l Hosp.*, 54 Ark.App. 130, 135, 923 S.W.2d 886, 889 (1996) (citing *Weyerhaeuser Co. v. McGinnis*, 37 Ark.App. 91, 824 S.W.2d 406 (1992)). It is the employer's burden to prove that an actual, bona fide offer was made. *Id.* (citing Ark.Code Ann. § 11–9–522(c)(1)).[2] In *Cross, supra,* the claimant's supervisor testified that if the claimant was capable of performing the work, if a job was available, and if the claimant could work eight hours a day, there might be a position for her with the company. *Cross*, 54 Ark.App. at 135, 923 S.W.2d at 889. This court stated that the evidence showed that any type of job available to the claimant was "speculative and based on future circumstances." *Id.* In the present case, Wilson's employers stated that he would be "recommended" for a job; there was thus no definitive statement that he would be accepted for employment.

▮▮▮ The District points to Wilson's testimony wherein he stated that he was asked to come back to work ("My principal [Larry Muldrew] asked me to come back, see could I come back") as evidence that Wilson had a bona fide offer of employment. The District also notes Wilson's testimony on cross-examination that Muldrew called Wilson to ask him to come

back to work for the 2009 school year.[3] Thus, the District contends that Wilson had a bona fide and reasonably obtainable offer of employment, which Wilson refused. When there are contradictions in the evidence, however, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Flowers v. Ark. State Police*, 2010 Ark. App. 99, 377 S.W.3d 339. The issue is not whether this court might have reached a different result from the Commission; the Commission's decision will not be reversed unless it is clear that fair-minded persons could not have reached the same conclusions if presented with the same facts. *Mize v. Resource Power, Inc.*, 99 Ark.App. 415, 416, 261 S.W.3d 477, 478 (2007). The ALJ and the Commission resolved this question in Wilson's favor, and we do not disturb such resolution here.

Finally, the District argues that Wilson's voluntary resignation constituted an unjustifiable refusal of suitable employment that should have barred his claim for wage-loss benefits. Citing Arkansas Code Annotated section 11–9–526, the District argues that Wilson "should not be able to create a wage-loss claim by walking away from the work his employer provided and could have continued to provide." Having determined that Wilson was never given a bona fide offer of employment, however, the question of whether any such offer was justifiably or unjustifiably refused is moot.

▮▮▮ In its second point on direct appeal, the District asserts that the Commission's award of additional medical treatment was not supported by substan-

---

**2.** The District argues that Wilson's voluntary decision not to return for the 2008–2009 school year bars his claim for wage-loss benefits under the "clear language" in section 11–9–522(b). This section, however, makes no mention of an employee's decision not to return to work; rather, the "clear language"

addresses only situations in which the employee has returned to work, has obtained other employment, or has a bona fide offer to be employed.

**3.** Principal Muldrew was not called to testify at the hearing before the ALJ.

tial evidence. Arkansas Code Annotated section 11–9–508(a) (Supp.2009) requires employers to provide medical services that are "reasonably necessary in connection with the injury received by the employee." The employee has the burden of proving by a preponderance of the evidence that medical treatment is reasonable and necessary. *Richardson Waste, Inc. v. Corcoran*, 2010 Ark. App. 816, 379 S.W.3d 77; *Owens Planting Co. v. Graham*, 102 Ark. App. 299, 284 S.W.3d 537 (2008). What constitutes reasonably necessary treatment under the statute is a question of fact for the Commission. *Richardson Waste*, *supra*. Arkansas law is well settled that a claimant may be entitled to ongoing medical treatment after the healing period has ended, if the medical treatment is geared toward management of the claimant's injury. *Patchell v. Wal–Mart Stores, Inc.*, 86 Ark.App. 230, 184 S.W.3d 31 (2004) (citing *Artex Hydrophonics, Inc. v. Pippin*, 8 Ark.App. 200, 649 S.W.2d 845 (1983)).

Wilson testified at the hearing that he had ongoing pain in his shoulder and had still, as of that date, not regained full use of the shoulder and could not lift his left arm above his head. Wilson stated that his instructions from his treating physician, Dr. Young, were to return to the doctor if the shoulder continued to bother him. The last report from Dr. Young, dated July 10, 2009, notes that Wilson continued to have some "intermittent discomfort." Dr. Young stated that, if the shoulder interfered with Wilson's comfort, activities, or livelihood, "the thing to do would ... be more aggressive with possible surgical intervention," so he would see Wilson back for follow-up visits.

On the basis of this evidence, the ALJ found that "the record simply does not support the [District's] contention that additional medical treatment was not necessary after July 10, 2008." The ALJ thus found that Wilson had established that "continued follow-up with Dr. Young through the date of the hearing and continuing on to a date yet to be determined is reasonably necessary for treatment of [Wilson's] compensable shoulder injury."

On appeal, the District argues that the ALJ and the Commission erred in awarding additional medical benefits because the evidence demonstrated that Wilson had "not yet" reached a point where he needed to return to the doctor. According to the District, this rendered the award of additional medical benefits speculative and tantamount to an "advisory opinion about what might be necessary in the future." The District maintains that the lack of medical evidence beyond Dr. Young's July 10, 2009 report caused the Commission's decision to be erroneous.

■ The District, however, fails to cite any cases in support of its claim that the award of medical benefits was speculative. Arkansas law is well settled that we will not consider the merits of an argument when an appellant fails to cite any convincing legal authority in support of that argument, and it is otherwise not apparent without further research that the argument is well taken.[4] *Smith–Blair, Inc. v.*

---

4. The District cites Ark.Code Ann. § 11–9–704(c), which provides that ALJs and the Commission shall determine whether a party has met its burden of proof by examining the record as a whole, and Ark.Code Ann. § 11–9–705(c)(1)(A), which provides that all oral or documentary evidence shall be presented at the initial hearing on a controverted claim. These citations, however, offer no support to the District's argument that the Commission's award of additional medical benefits was somehow speculative. The District also cites several cases in its reply brief regarding the propriety of issuing advisory opinions. However, the District did not raise the issue of ripeness and advisory opinions in its arguments before the ALJ, and it is well settled that arguments cannot be raised for the first

*Jones,* 77 Ark.App. 273, 72 S.W.3d 560 (2002); *Matthews v. Jefferson Hosp. Assoc.,* 341 Ark. 5, 14 S.W.3d 482 (2000).

Moreover, the Commission's decision was based on Dr. Young's statement that he felt it appropriate to see Wilson in the future if Wilson continued to have pain that interfered with his daily activities. *See Patchell,* 86 Ark.App. 230, 184 S.W.3d 31 (holding that claimant is entitled to ongoing medical treatment if such is geared toward management of the claimant's injury). Accordingly, we affirm on this issue as well.

### Cross–Appeal

 In his first argument on cross-appeal, Wilson argues that the Commission's refusal to award him temporary total disability for the period between December 1, 2007, and February 19, 2008, was not supported by substantial evidence. Temporary total disability for unscheduled injuries is that period within the healing period in which a claimant suffers a total incapacity to earn wages. *Smallwood v. Ark. Dep't of Human Servs.,* 2010 Ark. App. 466, 375 S.W.3d 747; *Poulan Weed Eater v. Marshall,* 79 Ark.App. 129, 84 S.W.3d 878 (2002). The healing period is that period for healing of an accidental injury that continues until an employee is as far restored as the permanent character of his injury will permit, and the healing period ends when the underlying condition causing the disability has become stable and nothing in the way of treatment will improve the condition. *Smallwood, supra.* The determination of when the healing period has ended is a factual determination for the Commission and will be affirmed on appeal if supported by substantial evidence. *Id.; Poulan, supra.*

time in one's reply brief. *See Maddox v. City of Fort Smith,* 346 Ark. 209, 56 S.W.3d 375 (2001).

As mentioned, the issue is whether Wilson was entitled to additional temporary total disability benefits for the period between December 1, 2007, and February 19, 2008. Dr. Young authored an office note on November 12, 2007, that stated "[l]ight duty is fine. Protected activities with the affected left shoulder." In addition, on November 30, 2007, Dr. Young signed a return-to-work form that imposed restrictions on Wilson of no lifting over twenty-five pounds and no overhead lifting. The line that said "May return to work on _____," however, was left blank, and the box next to that line was unchecked. Also on November 30, 2007, the District's Claims Specialist Melody Tipton sent a letter to Wilson and to the District that contained the following:

Dear Mr. Wilson,

I have been notified that Dr. Young has released you to return back to work Monday 12/3/07 with restrictions of no lifting over 25lbs and no overhead lifting. You may return to full duty gradually within 3 weeks.

I have spoken with your supervisor Maurice Henry and the school is able to accommodate those restrictions. This letter is to place you on notice to report to work on 12/3/07.

If you have any questions please call me....

Wilson testified at the hearing about what happened after he received the letter from Tipton:

Q: Now, Ms. Tipton, in this letter, says that she's been notified that Dr. Young has released you to return back to work Monday, December 3rd, with restrictions of no lifting over twenty-five pounds and no

overhead lifting, and you may return to full duty gradually within three weeks. Had Dr. Young's office notified you about that?

A: No.

Q: As you sit here today, have you ever seen a note that says that he's going to release you as of December 3rd and have you gradually go back to full duty in three weeks?

A: No.

Q: Now, we have a note here, November 30, 2007, that doesn't have a return to work date on it. In fact, it's left blank. Did that come with the letter?

A: No.

Q: So, when you got this letter in certified mail from Ms. Tipton, what did you do?

A: Called my supervisor.

. . . .

Q: As you can best recount it for us, tell us what occurred in that telephone conversation.

A: I got the letter, I called Mr. Henry, and he said he had a letter, too. I said this says I have to go back to work. Mr. Henry said, how can you go back to work? Man, you're all messed up.

Q: Did Mr. Henry say that he had a release to return to work from the doctor?

A: No, he did not.

Q: But he had the letter from the insurance company just like you did?

A: Right.

Q: Had anybody from the doctor's office called to let you know there'd been a change?

A: No.

Q: So, at that point, the only information that you had that there had been a change was just what you got in the mail?

A: From Ms. Tipton.

Q: But she didn't have anything from the doctor's office in the letter?

A: No. She just sent me that.

Q: So what did Mr. Henry tell you on the phone about what he knew about the letter.

A: He asked me—When I called him, I said, I have a letter from workers' compensation for me to go back to work, and he said, I got one, too.

Q: Was there any discussion with him about whether he had any documentation about you being released to return to work?

A: No. We just talked about the letter.

Q: Okay. So what did he tell you as far as you coming back to work at that time?

A: Well, we didn't discuss that.

Q: When you called him, why did you call him?

A: I got a letter and asked him what was it all about.

Q: Okay. Well, did he tell you that he wanted you to come back to work at that time?

A: No.

Q: Did he instruct you that you were supposed to return back to work or—

A: No.

Q: —that he needed to meet with you about setting you up to go back to work or anything?

A: No.

Q: Since you hadn't heard from the doctor's office about it, did you know anything about it?

A: No.

Wilson further testified that the first discussion he had with Dr. Young about

returning to work was in February 2008, at which time Dr. Young gave him a note releasing him to return to work. That note, dated February 11, 2008, contained the notation that Wilson "[m]ay return to work on 2–12–08" with the same restrictions of no lifting over twenty-five pounds and no overhead lifting. After receiving the note from Dr. Young, Wilson testified that he spoke to Henry and Montgomery, and they agreed to accommodate him at work with those restrictions, memorializing the agreement in a letter and a revised work schedule, both dated February 14, 2008. Because Wilson had a doctor's appointment on February 12, 2008, however, everyone agreed that he could return to work on February 19, 2008.

Maurice Henry testified that he received a phone call from Melody Tipton in which she stated that Dr. Young's office had released Wilson to return to work under certain restrictions. After receiving the letter from Tipton stating as much, Henry received a phone call from Wilson, who said that he had *not* been released by the doctor. Although Henry advised Wilson that the District would accommodate him and that he could return to work on December 3, 2007, Wilson said he was going to see Dr. Young because he had not been released to return to work. Wilson did not get back in touch with Henry to say whether he ever contacted Dr. Young, and he did not return to work until February 2008.

On the basis of this evidence, the ALJ, and subsequently the Commission, found that Wilson's account of events was not credible. The ALJ noted that Dr. Young's records contained a document dated November 12, 2007, indicating that Wilson could perform light-duty work and a November 30, 2007 document specifically listing the restrictions of no overhead lifting and no lifting over twenty-five pounds.

The ALJ also found it significant that Wilson did not telephone Henry prior to December 3, 2007, and did not call Tipton about the release. Finally, the ALJ pointed out that Wilson did not produce any documentation to prove that Dr. Young took him back off work after generating a document indicating that Wilson could perform light-duty work as of November 12, 2007. Under those circumstances, the ALJ found that the District offered Wilson employment beginning on December 3, 2007, which was suitable to his capacity, and that Wilson's refusal to return to the offered employment on December 3, 2007, was not justified. Accordingly, the ALJ found that the period of additional temporary disability compensation at issue was barred by Arkansas Code Annotated section 11–9–526.

On cross-appeal, Wilson argues that the ALJ and the Commission erroneously based their decisions that he had been cleared to go back to work on the letter from Melody Tipton, a claims adjuster, rather than on a doctor's note releasing him to return to work. Wilson argues that the November 30, 2007 document does not literally state that he was released to return to work and that he did not receive any documentation that specifically contained a release until the February 12, 2008 note. Therefore, Wilson argues, any refusal to return to work in December 2007 was not unreasonable, and the denial of temporary total disability was erroneous.

In addition to proving that one is totally incapacitated, a claimant must also prove that he remains in the healing period in order to be awarded temporary total disability benefits, and the determination of when the healing period ends is a factual determination to be made by the Commission. *Nix v. Wilson World Hotel,* 46 Ark.App. 303, 879 S.W.2d 457 (1994).

The Commission also has the duty of weighing the medical evidence as it does any other evidence, and resolving any conflict is a question of fact for the Commission. *Id.* When reviewing findings of fact made by the Commission, we must affirm if the Commission's decision is supported by substantial evidence. *Woodall v. Hunnicutt Constr.*, 340 Ark. 377, 12 S.W.3d 630 (2000). When, as here, the Commission denies coverage because the claimant failed to meet his burden of proof, the substantial-evidence standard of review requires that we affirm the Commission's decision if its opinion displays a substantial basis for the denial of relief. *Id.* Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

We do not agree with Wilson that the Commission's decision fails to display a substantial basis for the denial of relief. Although Wilson claimed that he believed he had not been cleared to return to work until February 2008, the Commission simply did not believe him. Because the determination of the credibility and weight to be given to a witness's testimony is solely for the Commission, Wilson's argument on this point is without merit. *See Steak House v. Weigel*, 101 Ark.App. 81, 270 S.W.3d 365 (2007); *Williams v. Brown's Sheet Metal/CNA Ins. Co.*, 81 Ark.App. 459, 462, 105 S.W.3d 382, 384 (2003).

Wilson's second argument on cross-appeal concerns the Commission's finding that he sustained only a 2% impairment to his wage-earning capacity in excess of the 7% permanent anatomical impairment established by the medical evidence. Pursuant to Arkansas Code Annotated section 11–9–522(b)(1) (Supp.2009), when a claimant has been assigned an anatomical-impairment rating to the body as a whole, the Commission has the authority to increase the disability rating, and it can find a claimant permanently and totally disabled based upon the wage-loss factor. *Lee v. Alcoa Extrusion, Inc.*, 89 Ark.App. 228, 233, 201 S.W.3d 449, 454 (2005). The wage-loss factor is the extent to which a compensable injury has affected the claimant's ability to earn a livelihood. *Id.*, 201 S.W.3d at 454. The Commission is charged with the duty of determining disability based upon a consideration of medical evidence and other matters affecting wage loss, such as the claimant's age, education, work experience, and other matters reasonably expected to affect his future earning capacity. *Id.* at 233, 201 S.W.3d at 454; Ark.Code Ann. § 11–9–522(b)(1). In considering factors that may affect an employee's future earning capacity, we consider the claimant's motivation to return to work, because a lack of interest or a negative attitude impedes our assessment of the claimant's loss of earning capacity. *Lee*, 89 Ark.App. at 233, 201 S.W.3d at 454.

In reaching the determination that Wilson suffered a 2% wage loss, the ALJ acknowledged that Wilson "worked with some degree of pain in his left shoulder" from February to August 2008. The ALJ credited Henry's testimony, however, that Wilson did not complain about his shoulder to Henry while at work during that period. In addition, the ALJ noted that Dr. Young stated that, as of June 30, 2008, Wilson was "doing reasonably well," could engage in "activities as tolerated," and had symptoms that were "reasonably well controlled." The ALJ also commented that Wilson was a sixty-nine-year-old high-school graduate who had worked in custodial jobs for the last forty-five years. Prior to his injury, Wilson had planned to work for the District for two more years and had contemplated retiring when he reached the age of seventy. Thus, the

ALJ concluded that, "[a]fter considering [Wilson's] advanced age, his limited education and work experience, the nature and extent of his injury and impairment, his post-injury earning, and all other relevant factors, I find that [Wilson] sustained a 2% impairment to his wage-earning capacity." The ALJ noted, however, that Wilson's decision in May 2008 to not seek a new contract for the 2008–2009 school year impeded his ability to assess the extent of his wage-loss disability after he last worked in August 2008.

Wilson argues on cross-appeal that this decision was "contrary to precedent," citing *Taggart v. Mid Am. Packaging*, 2009 Ark.App. 335, 308 S.W.3d 643. In *Taggart*, the claimant (Taggart) was a fifty-seven-year-old woman who had been working in various positions for her employer since 1977. In 2003, Taggart was working as a senior boiler operator and earning around $67,000 per year. In December of that year, she sustained a work-related injury that left her incapable of performing the job duties of that position. Taggart was terminated in August 2005 because she had been on medical leave for over a year, and the company did not have a job available for her within her physical limitations. After her termination, Taggart began studying for an associate's degree with the intent to take a job as a social worker, at which she could expect to make between $28,000 and $35,000 a year. *Id.* at 3, 308 S.W.3d at 645. The ALJ awarded Taggart a 20% wage loss, and on appeal, she claimed that the award should have been higher. *Id.* at 4, 308 S.W.3d at 646.

This court agreed, noting that the claimant was making more than $67,000 a year prior to the accident, and the most she could expect to make as a social worker was $35,000 per year. Thus, the court determined that the ALJ failed to properly consider her pre-injury earnings when determining her wage-loss disability and erred in concluding that her wage-loss disability was no more than 20%. *Id.* at 5–6, 308 S.W.3d at 647.

In the instant case, Wilson argues on cross-appeal that, prior to his injury, he was earning $431 per week, and now

> he could at best find a job, perhaps as a ticket taker or a cashier at a convenience store, paying minimum wage, if he would find one at all. Minimum wage would pay close to $300 per week, resulting in an income reduction of approximately $141 per week, or roughly thirty percent.

Thus, under *Taggart*, Wilson claims that he should have been awarded at least 30% wage-loss disability benefits.

At the hearing, however, Wilson did not introduce any testimony or other evidence that he had ever sought or intended to seek any other minimum-wage employment; indeed, he testified that it had been his intention to retire at age seventy in any event. As noted above, when the Commission denies coverage because the claimant failed to meet his burden of proof, the substantial-evidence standard of review requires that we affirm the Commission's decision if its opinion displays a substantial basis for the denial of relief. *Woodall v. Hunnicutt Constr.*, 340 Ark. 377, 12 S.W.3d 630 (2000). As Wilson failed to put forth any proof that he was entitled to any greater amount of wage-loss disability, we affirm the Commission's decision.

Affirmed on direct appeal; affirmed on cross-appeal.

GLADWIN, J., agrees.

VAUGHT, C.J., concurs.

LARRY D. VAUGHT, Chief Judge, concurring.

I concur in the disposition of this case and agree that the majority opinion conforms with the strictures of Arkansas's code and case law. I write separately solely to point out the absurdity that results when the facts of this case are siphoned through our state's legal filters.

In 2008, as was the custom at the end of every school year, Mr. Wilson was asked by his supervisor if he planned to return to work the following year. Mr. Wilson signed a "letter of intent" indicating that he would not come back. Based on his express declination of future employment with the district, Mr. Wilson was not offered a contract for the 2009 school year.

|₂₂However, because there was no "bona fide and reasonably obtainable offer to be employed" by the district, Mr. Wilson was awarded wage-loss benefits. Ark.Code Ann. § 11–9–522(b) (Repl.2002). In other words, Mr. Wilson affirmatively stated that he did not want a job with the district; as a result, he was not offered a job with the district; yet he asked for and received wage-loss benefits based on the district's failure to offer him a job. The district is caught in the web of a classic *Catch–22* situation.

Although claimants are well acclimated to the harsh realities and sometimes absurd results produced by the "strict construction" of the Arkansas Workers' Compensation Act, it is refreshing to see that what is good for the goose is good for the gander.